IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL D. BAILEY,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>DARREL G. ADAMS,<br><br>　　　　　Respondent. | Case Number C 06-1004 JF<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |

**I. INTRODUCTION**

Petitioner Michael Bailey ("Bailey") is lawfully in the custody of the California Department of Corrections and Rehabilitation (CDCR) pursuant to a valid judgment and conviction in the Riverside Superior Court. Bailey was found guilty of willful infliction of corporal injury in violation of California Penal Code § 273.5. He also received a four-year sentence enhancement pursuant to California Penal Code § 12022.7 for inflicting great bodily harm on a child, and a five-year enhancement pursuant to California Penal Code § 667(a) for having a prior serious felony conviction. He is serving a total prison sentence of nineteen years.

Bailey does not challenge his conviction or his sentence. The present petition is limited to discipline imposed as a result of a rule violation report (RVR) he received on June 8, 2005. For the reasons discussed below, the petition will be denied.

## II. BACKGROUND

On June 4, 2005, a staff member was assaulted at the California Substance Abuse Treatment Facility (CSATF). As a result, the facility went into lockdown status. On June 8, 2005, Facility C supervisors met with the executive body of the Inmate Advisory Counsel (IAC), including Bailey, who was the IAC Vice Secretary, to discuss the impact of the lockdown. After the meeting, Sergeant Curtiss instructed staff to escort the IAC members through the housing units to disseminate information about the lockdown. Yard staff was escorting Bailey back to his cell when Bailey asked to speak with a sergeant. Curtiss asked Bailey what he wanted, and Bailey reported that after talking to the inmates in the units, he had come to the conclusion that the assault was the fault of the staff. Though the inmate in question previously had assaulted other inmates and twice had been written up for threatening staff, staff nonetheless had allowed the inmate to remain in the general population of the institution. Bailey told Curtiss that he had discussed this issue with other inmates, who were in agreement with his assessment of the situation.

In response to Bailey's comments, prison staff concluded that Bailey was a threat to institutional safety and security and placed Bailey in administrative segregation. He subsequently was charged with inciting a riot. In a written statement, Officer Diaz stated that he had heard Bailey say that the assault was "the administration's fault, not ours. We should not be on lockdown." In another written statement, Officer Boyd stated that he overheard Bailey discussing the incident with inmate Bell, the Vice Chairman of the IAC, and claiming that the administration had "dropped the ball and the inmate population shouldn't be punished for [the] administration's mistake." Both officers described Bailey as angry when he made the statements. Curtiss later testified that Bailey was irritated during their conversation, but that his tone of voice was "normal. He was not yelling or screaming." Bell testified that Bailey's behavior was "all business." Bailey asserted that after his conversation with Curtiss, he was allowed to continue to the lower yard for more than an hour and a half.

Officer Mobert was assigned to assist Bailey at his disciplinary hearing. Mobert interviewed Bailey and took his statement. Bailey denied the charge against him and said that he

shared his opinion with institutional officials in order to make them aware of the problem and thereby avoid a lengthy lockdown of African-American inmates, which he believed would be counterproductive to the IAC's goal of maintaining cordial relations between inmates and staff. Bailey also provided a list of questions for Curtiss, Diaz, Boyd, and Bell, all of which were answered. Bailey requested that these individuals attend the hearing. Curtiss, Diaz, and Boyd appeared and testified at the hearing; Bell did not appear because Mobert determined that Bell had no additional evidence to provide. Mobert also prepared a written report, which was given to Bailey on June 19, 2005.

A disciplinary hearing was held on June 21, 2005. Bailey declined to testify at the hearing, but he requested that the Senior Hearing Officer refer to his statement in the investigative employee's report, which was read into the record. The Senior Hearing Officer then asked Bailey why he did not notify staff of his concerns through a "kite" (prison note). Bailey testified that, "We don't drop kites, we were going to get him."

After considering the evidence, the Senior Hearing Officer found Bailey guilty of inciting a riot and assessed a penalty of ninety days' lost credit. Bailey also was referred to the Institutional Classification Committee for placement in a security housing unit. The Chief Disciplinary Officer later reduced the charge to behavior which could lead to violence and reduced the loss of credit to thirty days.

On April 21, 2006, Bailey filed a petition for writ of habeas corpus in the California Court of Appeal claiming that the discipline violated his First Amendment rights. That petition was summarily denied on April 27, 2006. Bailey then filed a petition in the California Supreme Court, which also was summarily denied.

### III. DISCUSSION

This Court is limited to assessing whether the decision of the state courts was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] case,' or if it 'confronts a set of

1   facts that are materially indistinguishable from a decision'" of the Supreme Court and
2   nevertheless arrives at a different result. *Carey v. Muscadine*, 127 S. Ct. 649; *Early v. Packer*,
3   573 U.S. 3, 8 (2002). This Court applies these standards to the last reasoned state court decision.
4   *Avila v. Galaxy*, 297 F.3d 911, 918 (9th Cir. 2002). When, as here, the state courts have not
5   addressed the constitutional issues in a reasoned decision, federal courts may engage in an
6   independent review. Independent review of the record, however, "is not de novo review of the
7   constitutional issue, but rather, the only method by which [the court] can determine whether a
8   silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853
9   (9th Cir. 2003).
10       The Supreme Court has held that there is no heightened standard of scrutiny reviewing
11  prisoners' constitutional claims. Instead, the proper standard is to "[inquire] whether a prison
12  regulation that burdens fundamental rights is 'reasonably related' to legitimate penological
13  objectives, or whether it represents an 'exaggerated response' to those concerns.'" *Turner v.
14  Safely*, 482 U.S. 78, 89 (1987). In determining reasonableness, relevant factors include (a)
15  whether there is a "valid, rational connection" between the regulation and a legitimate and
16  neutral governmental interest put forward to justify it, which connection cannot be so remote as
17  to render the regulation arbitrary or irrational; (b) whether there are alternative means of
18  exercising the asserted constitutional right that remain open to inmates, which alternatives, if
19  they exist, will require a measure of judicial deference to the corrections officials' experts; (c)
20  whether and the extent to which accommodation of the asserted right will have an impact on the
21  prison staff, on inmates' liberty, and on the allocation of limited prison resources, which impact,
22  if substantial, will require particular deference to corrections officials; and (d) whether the
23  regulation represents an "exaggerated response" to prison concerns – in other words, whether
24  there is a ready alternative that fully accommodates the prisoners' rights at de minimis costs to
25  valid penological interests. *Turner*, 482 U.S. at 89-91.
26       According to the Senior Hearing Officer's report, Bailey initially was charged with
27  inciting a riot because the officials believed that Bailey "intended to stir up mixed emotions
28  within the prison population to where they would view the administration as being corrupt and at

1  fault." While it is within the purview of prison officials to anticipate and quell potentially
2  dangerous speech, the record in this case suggests that the officials' initial response to Bailey's
3  actions was exaggerated.

4      By reducing Bailey's charge from inciting a riot to behavior which could lead to violence,
5  the Chief Disciplinary Officer recognized implicitly that the Senior Hearing Officer had
6  overreached.  The Senior Hearing Officer claimed that "due to Bailey's observed behavior, it was
7  his intention to incite a riot no matter what he may claim to the contrary."  This particular
8  statement appears to be wholly unsupported.

9      The California Department of Correctional Services evidenced a clear desire to elicit
10 inmate input when it created California Code of Regulations Title 15 § 3230(a)(1), which states
11 that "[e]ach warden shall establish an inmate advisory council which is representative of that
12 facility's inmate ethnic groups . . . Council members shall serve to advise and communicate with
13 the warden and other staff those matters of common interest and concern to the inmate general
14 population."  Bailey was an executive member of the IAC.  By reporting the opinions of his
15 fellow inmates to Curtiss, Bailey was fulfilling his duty as an IAC member to maintain positive
16 relations between inmates and staff.

17     There is no evidence that Bailey's statements were made under circumstances that would
18 incite a riot.  While they were going to the inmate housing units to disseminate information about
19 the lockdown, IAC members were escorted by prison guards at all times; any attempts to incite
20 dangerous behavior among the inmates at that time would have been stymied by the guards.  The
21 statement for which Bailey initially was placed into administrative segregation was made to
22 Curtiss, a prison staff member.  Bailey also points out that after his conversation with Curtiss, he
23 was allowed to continue to the lower yard for more than an hour and a half.  If the officers
24 believed Bailey was attempting to incite a riot, it is unlikely that they would have permitted him
25 to return to the yard.  *See* Cal. Code Regs. tit. 15, § 3270 ("Consistent effort will be made to
26 insure the security of the institution and the effectiveness of the treatment programs within the
27 framework of security and safety.").

28     The dispositive question thus is whether the record supports the reduced charge of

Case 1:06-cv-01004-JF   Document 16   Filed 09/30/09   Page 6 of 6

"behavior which could lead to violence." The Chief Disciplinary Officer apparently concluded that Bailey's claim that the lockdown was the fault of prison staff, viewed in light of the totality of the circumstances and the angry manner in which it was made, was beyond the bounds of Bailey's role as a member of the IAC.

While this Court may have reached a different conclusion were it considering the matter without deference, prison officials are entitled to considerable latitude in assessing institutional conditions. *Rhodes v. Chapman*, 452 U.S. 337, 362 n.9 (1981) ("prison officials must be accorded latitude in the administration of prison affairs, and . . . prisoners necessarily are subject to appropriate rules and regulations") (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)); *see also Turner*, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."). The Chief Disciplinary Officer considered the entire record, including Bailey's version of events. Because the Court cannot say that the Chief Disciplinary Officer's decision was objectively unreasonable, Bailey has not shown that he is entitled to habeas corpus relief.

## IV. DISPOSITION

For reasons discussed above, the petition for writ of habeas corpus is DENIED.

DATED: 9/29/2009



_____
JEREMY FOGEL
United States District Judge